THE PEOPLE, RESPONDENTS, *v.* EDWARD STOCK, APPELLANT.

IMPEACHMENT—WITNESS.—The rule for the introduction of evidence to contradict a witness is as follows: If the fact to which the contradiction applies is material to the issue, he may be contradicted; but when it is immaterial, and not within the issue, contradictory evidence can not be introduced.

EVIDENCE—REPUTATION OF DECEASED.—The rule is well settled that the reputation of the deceased can not be given in evidence, unless the circumstances of the case raise a doubt whether the defendant acted in self-defense.

JURY—DISCHARGING JURY.—There is no particular length of time prescribed by law for keeping a jury together. The time is entirely within the discretion of the court.

APPEAL from the second judicial district, Boise county. The defendant was convicted of murder in the first degree. On the trial he offered testimony to contradict one of the witnesses for the people, which was excluded by the court, as was also testimony offered to show that the deceased was a man of a violent and quarrelsome disposition. The rulings of the court excluding such testimony are assigned as error; and, also, the instruction given to the jury after they had been deliberating on the case several hours, to the effect that it was their duty to agree—to harmonize their views if they possibly could, consistently with their duty as sworn jurors.

*Rosborough & Preston and S. A. Merritt,* for the appellant, on the question of the admissibility of the testimony

excluded, cited: 1. Greenl. Ev., par. 462; 2 Phil. Ev. 959 et seq.; *Patchin* v. *The A. M. & Co.*, 3 Kern. 268; *Hathaway* v. *Crocker*, 7 Metc. 262; *Gould* v. *N. L. Co.*, 9 Cush. 338; *Palmer* v. *Haight*, 2 Barb. 210; *Sprague* v. *Caldwell*, 12 Id. 516; *Howard* v. *C. F. I. Co.*, 4 Denio 502; *People* v. *Murray*, 10 Cal. 309; 1 Archb. Crim. Pr. and Pl. 400, 401; 1 Whart. Crim. L. 641.

No appearance for the people.

Kelly, J., delivered the opinion of the court, McBride, C. J., and Cummins, J., concurring.

The defendant was convicted of murder in the first degree, and judgment pronounced against him accordingly. From this judgment the defendant appeals, and assigns errors as follows :

1. The court erred in excluding the testimony of the witness Samuel A. Merritt, and also that of the witnesses J. B. Pierce and S. Maloney, offered by defendant, for the purpose of impeaching the witness Kelly.

2. The court erred in excluding the testimony of J. B. Taylor, Joseph Boss, John Cody, Stephen Maloney, and J. P. Pierce, offered by the defendant to show that the general reputation of deceased was that of a violent and dangerous man, habitually addicted to quarrels, fighting, and bloodshed.

3. The court, after having excluded testimony as aforesaid, erred in its admonitions to the jury, who were still in doubt as to the degree of crime, on the third day of their deliberations, notwithstanding the exclusion of testimony as aforesaid.

4. Error affecting substantial rights of the defendant, the court erred in overruling his motion and denying a new trial.

The defense introduced a witness, Pierce, who stated that deceased was a large man, powerfully built, of great strength, and, in that respect, greatly superior to the defendant, who was a small, weakly man, which was all the testimony on that point. The defendant then offered to show by the testimony of J. B. Pierce, Stephen Maloney, John Cody,

Joseph Boss, and J. B. Taylor, that they were acquainted with deceased, and knew his general reputation in the community where he resided and was well known, and that his general reputation was that of a violent and dangerous man, habitually addicted to general fighting and bloodshed. The court excluded the testimony so offered, and defendant excepted to such ruling.

Kelly, a witness for the prosecution, testified that on the evening before the homicide the deceased and defendant came to his saloon; that deceased struck defendant on the side of the face, so as to turn his face to one side, that it was more of a push than a blow, and defendant said, "I will kill you if you do that again;" that deceased replied, "You are not able to kill me," and defendant said he could kill six men while deceased could kill one; that what led deceased to strike- or push defendant was they had taken a drink, and defendant pulled out his purse to pay for it, and deceased reached out his hand for the purse, and defendant told him it would cost him his life to take his purse.

On cross-examination this witness was asked if deceased did not say to him on that occasion that he intended to rob defendant of his purse for a Lemhi stake, and the witness replied in the negative. He was then asked if he had not in a conversation with Samuel A. Merritt on the second day after the homicide, in the street in front of Nicholdson & Clark's store in Idaho City stated to said Merritt, that on the occasion above referred to, the deceased told him he intended to rob the defendant of his money and keep it for a Lemhi stake, and the witness answered that he had not so stated, and that he had never made any such statement to Merritt or any one else. For the purpose of impeaching said witness, the defendant offered said Merritt as a witness to prove that said Kelly had at the time and place indicated and also at a subsequent time, made the statement so denied, and also offered J. B. Pierce and S. Maloney to prove that said Kelly had about the same time in their presence and in a public saloon made the same statement; all of which evidence, so offered, the court excluded, to which ruling the defendant excepted.

The evidence or statement of the defendant made in pursuance of our statute is incorporated into the record sent up to this court to sustain the second exception, and is as follows: "I had been with deceased on the afternoon of the day preceding the killing. We had been drinking together on the evening of the —— day of May. The day before the killing the deceased and myself went up to Bannock Bar. We stopped at the residence of Richard French, and I requested him to get supper for us, which he, French, agreed to do; and he went down town (Idaho City) to procure some articles. Shortly afterwards I went down to Idaho City to get a bottle of port wine for Mr. French, and the deceased followed me. I drank a great deal and became intoxicated. About eleven o'clock at night I started home, the deceased accompanying me. Between eleven and twelve o'clock we reached the house of Richard French. We went in. I had a bottle of port wine and some eggs. The deceased and I drank at French's. We left French's residence after remaining there some time. When I left French's I had my purse, containing about five hundred dollars in gold dust, in my pocket, and also a silver watch and chain. After we left French's deceased induced me to drink twice or more from the bottle of port wine which we had brought from French's, where I had left it. Deceased then blew out the candle which French had given us, or it went out, I don't know how, and took me into a vacant cabin, and where I immediately laid down and fell into a sleep. I have no recollection of anything until I waked up in the morning and found my watch and purse gone. The deceased was there. I accused him of taking them. He denied the charge. I then went down to the house of Richard French and asked him if I had my watch when I left his house the night previous. He stated that I had, and that he had asked me the time, and I had pulled out the watch and he saw it. I then returned to the cabin where I left deceased, and asked him to give me my money and watch, stating that he, the deceased, was a strong, healthy man and able to work, and that I was sickly and feeble and needed my means for my support. I reproached

deceased with the manner he had treated me after my kind-ness to him. The deceased called me a son of a bitch, and told me to help myself. I then told him I would go down and have him arrested by the officers for robbing me. The deceased immediately rushed towards me in a threaten-ing manner, saying he would wring my neck. He being a very powerful man, and fearing that he would kill me, or inflict some great bodily injury upon me, as he rushed to-wards me, I drew my pistol and fired twice, very rapidly, the deceased seizing my pistol with both of his hands, and trying to wrench it from my grasp. I did not know that any shot had taken effect on deceased; and in the struggle for the pistol, I drew my knife with my left hand, and, I sup-pose, I cut him, although I can not answer that I did. Upon repeating to deceased several times that I would cut him if he did not let go the pistol, he let go and went off. I did not know whether deceased was hurt or not. I went down to Idaho City, and was arrested at the Idaho brewery."

The first question submitted is: Did the court err in re-fusing to admit the testimony of S. A. Merritt, J. B. Pierce, and S. Maloney, offered by defendant for the purpose of im-peaching the witness Kelly? The rule laid down for the in-troduction of other evidence to contradict a witness is this: If the fact to which the contradiction applies is a material fact, within the issue, he may be contradicted by any evi-dence or other statement, but when it is not material, and not within the issue, contradicting evidence can not be in-troduced. When a witness testifies to a material fact within the issue, the adverse party may give evidence that the wit-ness has at some other time, or at various times, given a different statement of the fact. It goes to show that his present statement is erroneous or false as to such material fact. Such contrary statements may be proved by the wit-ness himself or other evidence or by both.

In the cross-examination of witnesses, the adverse party is allowed great latitude of inquiry, limited only by the sound discretion of the court, with a view to test the memory, the purity of principles, the skill, accuracy, and judgment of the witness; the consistency of his answers

with each other, and with his present testimony; his life and habits; his feelings towards the parties respectively, and the like, to enable the jury to judge of the degree of confidence that may safely be placed in his testimony. The rule is that when the question is relative to a fact collateral to the issue, and not material to it, the answer of the witness must be taken as it is given, and other evidence can not be offered to contradict him; and the reason of the rule is obvious. The cross-examination, to the extent mentioned, is allowed only for the purpose of exhibiting the witness in his true light to the jury, and when that is done the whole purpose of cross-examination is accomplished. A witness, therefore, can not be called to contradict what another witness has thus testified on cross-examination, relative to a fact not material to the issue.

Having laid down the rule, we are now to determine whether the testimony of Kelly was material to the issue, or whether it was collateral testimony. Kelly says " that on the evening before the homicide, the deceased and defendant came to his saloon, that deceased struck defendant on the side of the face so as to turn his face to one side," that it was more of a push than a blow, and defendant said: "I will kill you if you do that again." That deceased replied: "You are not able to kill me." And defendant said he could kill six men while deceased could kill one; that what led deceased to strike or push defendant was they had taken a drink, and defendant pulled out his purse to pay for it, and deceased reached out his hand for the purse, and defendant told him it would cost him his life to take his purse. Collateral testimony consists of those circumstances or facts given in evidence which are unconnected with the issue or matter in dispute. It is sometimes difficult to determine when a particular fact offered in evidence will or will not be material to the progress of the case. Had the killing taken place in Kelly's presence in consequence of the circumstances which he related, or rather if deceased had again struck or pushed defendant, and reached out for the purse, and defendant had killed him as he threatened he would, there could be no doubt as to the

materiality of the testimony. We might go still further. If this circumstance had been the origin of a general quarrel which was followed up without abatement until the next day (the time of the homicide), and the killing had been the immediate result of an unabated quarrel which had thus originated, it would be material testimony.

Take his evidence alone, disconnected as it is from the homicide which took place on the next day, what inference can be drawn from the conduct of the parties, as testified to by Kelly on the day previous? Defendant and deceased were drinking together, deceased gave defendant a pushing blow on the side of the face, and reached for defendant's purse, as defendant took it out to pay for the drinks. Defendant said he would kill him if he did so again. Can it be inferred from this conduct that deceased attempted to rob defendant or that defendant intended to kill deceased? I can see no reason for drawing such an inference. The most that we could say of this conduct is, that it was rude and unmannerly on the part of the deceased, and the language of defendant was vile and extravagant. Certainly this did not prevent them from being friends. They went away together; went to French's cabin on Bannock Bar, where they had previously ordered supper; eat together; sat up some time and talked together after supper even to a very late hour; then went to a cabin together and slept together or in the same room, and remained there until the homicide the next day, and apparently were as friendly as companions generally are, if not more so. I can see nothing material in this testimony. Many other circumstances that took place between deceased and defendant on the day previous to the homicide may have been given in evidence with as much propriety as this circumstance. Had the defendant insisted that this circumstance was an attempt to rob him and he had conducted himself with proper caution in regard to the company of deceased, and there was probable ground for the jury to believe that deceased had been killed by defendant in the act of again attempting to rob him, the testimony might possibly have been material; but no such defense is contemplated. The defendant

sought to justify the killing only upon the ground that deceased made an assault upon him with the intent to do him some great bodily injury, of which we shall speak hereafter.

The rule appears to be well settled that before the credit of a witness can be impeached by proof that he made statements out of court contrary to what he has testified to at the trial, he must first be asked as to time, place, and person involved in the supposed contradiction. We are of the opinion that the foundation was well laid, but we are of the opinion that the evidence of Kelly was collateral to the issue, and the defendant was bound by the answer of the witness Kelly. The evidence sought to be introduced to impeach his statements was evidently ruled out upon these grounds, and we think very properly.

The second error complained of is "that the court excluded testimony to show that the general reputation of deceased (being physically a powerful man) was that of a violent and dangerous man; habitually addicted to quarrels and bloodshed." The rule is well settled that the reputation of the deceased can not be given in evidence, unless, at the least, circumstances of the case raise a doubt in regard to the question whether the prisoner acted in self-defense. It is no excuse for a murder that the person murdered was a bad man; but it has been held that the reputation of the deceased may sometimes be given in evidence to show that the defendant was justified in believing himself in danger when the circumstances of the case are equivocal. But the record must show this state of the case. The record submitted to show how the killing took place is the testimony or statement of the defendant given at the trial. It appears that the deceased and the defendant had eaten, drank, slept, and remained together in an amiable manner from some time in the day previous until the homicide. The defendant had lost his watch and purse of some five hundred dollars in gold dust, and accused the deceased of robbing him, and reproached him for the manner in which he (deceased) had treated him, and told him he would have him arrested by the officers for robbing him. The defendant says: "The deceased immediately rushed towards him in a threatening

manner, saying he would wring my neck. He being a powerful man, and fearing that he would kill me, or inflict some great bodily injury upon me, as he rushed towards me I drew my pistol and fired twice very rapidly, the deceased seizing my pistol with both his hands, and trying to wrench it from my grasp. I did not know that any shot had taken effect on the deceased, and in the struggle for the pistol I drew my knife with my left hand, and I suppose I cut him, although I did not know that I did. Upon repeating to deceased several times that I would cut him if he did not let go of the pistol, he let go and went off. I did not know whether deceased was hurt or not. I went down to Idaho City and was arrested at the Idaho Brewery."

When a man is assaulted in the course of a sudden brawl or quarrel, he may in some cases protect himself by killing the person who assaults him, and excuse himself on the ground of self-defense; but in order to entitle him to do so, he must make it appear: 1. That before a mortal stroke was given, he had declined any further combat; 2. That he killed his adversary through mere necessity, in order to avoid immediate death. To justify an acquittal on the ground of self-defense, the danger must have been actual and urgent. No contingent necessity will avail, and when the pretended necessity consists of the as yet unexecuted machinations of another, the defendant is not allowed to justify himself by reason of their existence. In cases of personal conflict, in order to prove this defense it must appear that the party killing had retreated, either as far as he could by reason of some impediment, or as far as the fierceness of the assault would permit him. There may be cases sometimes occurring, though very rare and of dangerous application, where the attack is so fierce as not to allow him to yield a step, without manifest danger of his life or enormous bodily harm; and then, in order to save his own life, he may kill his assailant if there be no other means of escape. And it is not for the party killing to judge alone of the reasonable grounds of his apprehension of danger at the time; he must decide upon his peril upon the force of circumstances in which he is placed, for that is a

matter which will be subject to judicial review. The defendant says that deceased rushed towards him with the threat that he would wring his (defendant's) neck, and he (defendant) drew his pistol and fired very rapidly twice. Defendant grabbed the pistol with both hands. Deceased was a very powerful man, much more so than defendant. Deceased was not armed, at least there is no evidence of the fact, and his having grabbed the pistol with both hands tends to show that he had no arms, or if he had he did not intend to use any. The defendant was armed with both pistol and knife. He stands his ground and fires twice before the deceased reaches him. He then draws his knife and stabs the deceased, without receiving any injury whatever himself. He gives no reason for not retreating, nor does he say that he would have withheld the shots if he could without endangering his own life. He gives no evidence of any hostile threats or any violence exhibited on former occasions against the defendant, nor does it appear but what the deceased and defendant had always been amiable friends.

We do not think that the evidence, applied to the rules of law, would permit the character of deceased to be made a matter of controversy in this case, and such testimony was properly ruled out.

The third point made by defendant's counsel is in reference to the admonitions of the judge to the jury. After the jury had been out, they came into the court on the third day and the judge charged them as follows: That it was the duty of the jury to agree. "And that considering the great expense attending criminal trials of this character, every reasonable effort should be made for that purpose. No pride of opinion should prevent any number of jurors from agreeing to a verdict when they can conscientiously agree to do so; and it is the duty of a jury to harmonize their opinions, if possible. I think, considering the importance of this case, I am justified in requiring you to make further effort to harmonize your opinions, and you will, therefore, return to consider further upon your verdict."

There is no limitation, either by statute or common law,

for keeping the jury together.   The time is entirely within the sound discretion of the court.   Two days and a half is not an unreasonable time, especially when there is a probability that the jury can agree.   We can see no abuse of discretion in this respect.   To charge the jury that it is their duty to agree is one of the most common charges made by every judge.   For that purpose, and that only, are they sent out to deliberate upon their verdict; otherwise they would give their verdict in their seats without consulting each other.   Taken in connection with the latter part of the charge, which says they should harmonize their opinions if they can conscientiously do so, we are at a loss to discover how the charge should work any injury to the defendant if the jury were to find a verdict upon such a charge.   It could not be inferred that they would be any more likely to convict than they would to acquit.

The ruling of the court below is sustained.

The order overruling the motion for a new trial is sustained and the judgment below affirmed, with directions to the court below to fix the time for carrying the judgment into effect.